And we will call the first case. Case number 14-1360 in re Detention of Brad Lieberman. Would the attorneys that are going to argue both sides please step up and identify yourselves for the record? Good morning, Your Honor. Anthony Pesci, Houston and Strachan for Appellant Mr. Brad Lieberman. Good morning, Your Honors. David Iskowich. I am representing the people in this case and I'm with the Illinois Attorney General's Office. Good morning. Each of you will have approximately 15 minutes to present your oral argument. And Mr. Pesci, from that you may save out some time for rebuttal. All right. The Court's Commission, Your Honor, will save four minutes? Certainly. All right. You may proceed. May it please the Court, good morning. My name is Anthony Pesci of Houston and Strachan and I represent the appellant, Mr. Brad Lieberman. Mr. Lieberman's case is fundamentally a civil rights case and it is Mr. Lieberman's liberty which is continually at stake. The Sexually Violent Persons Act, the act under which Mr. Lieberman is committed, is in principle there to protect the citizens of Illinois from those that we have deemed so dangerous that they can no longer remain in the rest of society. But the provisions, specifically Section 65 for discharge and the annual reexamination of those detained, are there to protect the individuals in state custody from unlawful or unnecessary incarceration. Under the act, detainees are entitled to a full trial on discharge so long as they can show some plausible evidence that they no longer suffer from a mental disorder which compels acts of sexual violence. Are you, may I just interrupt, you're not suggesting any release, a conditional release then, are you? No, Your Honor. Mr. Lieberman's appeal solely relates to Section 65. Correct. Specifically the issue of probable cause. Right, but there's two methods to get there. One of them would be a conditional release, isn't it? Yep, Your Honor is correct. All right, but you're not seeking anything under that because there was no testimony about whether or not there would be a conditional release. But if he were conditionally released, he wouldn't pose as, I forget the language. Dr. Ritman did opine that Mr. Lieberman would be able to comply with conditional release standards. However, the subject of the appeal is Section 65 for a discharge petition. All right. I mean, you're looking for a hearing, right? Correct, Your Honor. Yes, Mr. Lieberman's appeal is from a denial of probable cause such that if probable cause had been established, we would move to a full hearing. Okay. Now, if he is no longer subject to this mental disorder, how did it go away when he didn't have any medical attention? For one, Your Honor, I believe that would be a question that the experts would have to discuss at… Do you need experts for that? I mean, if he's no longer subject to this mental disorder, how did it go away when he didn't have any medical attention? I mean, if somebody has mental problems that seriously affect the public and doesn't take any, you know, he doesn't have, you know, he won't submit himself for an examination or for any treatment, and you're going to contend that this condition has gone away? I mean, did the tooth fairy come down and touch him? I mean, how did that happen? No, Your Honor. The tooth fairy was not involved. Even the State's expert, Dr. Weidel, during the deposition prior to the probable cause ruling testified that the disorder, as understood by Dr. Weidel and the State's doctors of PNOS, does not go away. Her testimony has consistently been that there is no specific treatment for it. There is no pill that makes it go away. There is only the ability to curb urges. And it is such that if an individual no longer has a mental disorder as defined by the Act, that means that they have volitional control over their abilities and no longer give in to the compulsion to commit acts of sexual violence. Well, in the scientific, or rather, psychiatric, psychological expert community, would it be fair to say that mental disorders don't simply go away? That usually the theory or the thought is that you have to treat a mental disorder? It doesn't just go away, does it? I cannot speak for all mental disorders. However, in the instance of paraphilia not otherwise specified, even Dr. Weidel, the State's expert, has testified that the issue of treatment is really more an issue of learning to control one's behavior, not necessarily a matter of administering a medication or even a therapy. Well, what did this expert that Mr. Lieberman called as a witness, how did he indicate that Mr. Lieberman no longer suffers from a mental disorder? What was the crux of his testimony? So Dr. Ritma, the opining expert, relied on two prime sources to determine that Mr. Lieberman no longer suffered from a mental disorder. The first was that he had several interviews with Mr. Lieberman where they discussed not only his background, but his current behavior in the Rushfield Detention Center, his thoughts, whether or not Mr. Lieberman continues to suffer from intense urges or compulsions towards sexual activity. There is certainly an extant element to that behavior in that Mr. Lieberman has a fairly impeccable record during his time at Rushfield. No, he hasn't been caught with contraband, he hasn't had... I thought he was caught with marijuana. Prior to his arrest in 1979. So he's had no violations while he's been committed to the Department of Human Services? I believe not, Your Honor. And even Judge Porter has commented colloquially that he has a fairly impeccable record for an individual who's been incarcerated as long as Mr. Lieberman has. Is he willing to submit to mental examinations? To mental examinations? Yes, he did sit for Dr. Ritma and had a two-hour session as well as another about an hour session during which Dr. Ritma administered several new psychometric tests. But he refused to appear for any examination by Dr. Weidel, didn't he? He has refused to appear for Dr. Weidel, that's correct. Did he refuse all the other experts that weren't appearing on his behalf over the course of time? Not in the entirety of his detainment. He has spoken with doctors for both the state and appointed experts as well as experts testifying on his behalf. But on this particular occasion, he refused. To speak with Dr. Weidel, that's correct. Don't you think that would be a first step to consent to that examination? Without speculating, Dr. Weidel, even during her own testimony, said that she didn't feel that a conversation with Mr. Lieberman would be that helpful, given that the basis of her opinion continued to be 30-year-old criminal behavior, 35-year-old criminal behavior now, and that very little of her opinion was based on moving forward with Mr. Lieberman and or his behavior in the facility itself. I have a question. If Dr. Ritma, I believe it is? Ritma, yes. If he made a determination that Mr. Lieberman is no longer psychosexual, then why should he be subjected to any examination at all? Because he says his conduct was criminal in nature and he had no psychosis. So then why send him in for a test anyway? Well, despite Dr. Ritma's opinion, Mr. Lieberman has been and continues to be detained by the state of Illinois as a person with a mental disorder. In order to be released from detention, he would have to no longer have that mental disorder. So it was Dr. Ritma's prerogative and mission to evaluate whether or not Mr. Lieberman continued to suffer from that disorder. And it was Dr. Ritma's conclusion, based not only on his examination, but also the administration of several new psychometric tests, which had never been considered by the jury, never been considered by Your Honors or any other court in Illinois. Through the administration of those tests, Dr. Ritma was able to determine that Mr. Lieberman had no present extant signs or symptoms of any paraphilic disorder, any antisocial personality disorder. Mr. Lieberman, on several personality tests that are designed specifically to measure both compulsiveness and psychopathy, was able to score consistently within the normal range. And it was Dr. Ritma's opinion that given the smattering of tests there, that you would expect to see someone peak up a little bit at least. And those were tests that were completely different than what Dr. Wiedel administered. Yes. Did he administer the same type of tests as Dr. Wiedel as well? No. So Dr. Wiedel administered sort of two tests. First of all, she relied on a static 99. Well, she couldn't do tests with him because he refused an examination. Isn't that true? That is true. All right. Now, when Dr. Wiedel was deposed, she was asked about the new tests that Dr. Ritma had performed. And several of them she was not familiar with at all. And the ones that she was familiar with, she had found in her to be reliable, but did not give them any weight. She dismissed them out of hand. As did the trial court. Dismissed the results of the tests as new scientific evidence relevant to the Disband Bridge Inquiry, which is that in order to establish probable cause, Mr. Lieberman would have to show new evidence that a jury or a court had not debated already, experts had not debated. The hair PCLR, the 2006 version of that test, the additional psychometric examinations that Dr. Ritma administered, as well as the fact that Dr. Ritma is an Illinois SOMD qualified evaluator for sexually violent persons, all of which is new evidence that no jury has ever evaluated or debated. So could we go back to my question? What did Dr. Ritma say in terms of how Mr. Lieberman no longer suffered from a mental disorder? Was it because of the evidence of the tests? Did he say that? What did he opine as far as the reason that he believed Mr. Lieberman no longer suffered from the mental disorder? Mr. Lieberman, Dr. Ritma opined that Mr. Lieberman did not satisfy any diagnostic criteria for paraphilia, not otherwise specified or any other paraphilic disorder. Specifically under the DSM-IV-TR, which was the version of the DSM that Dr. Ritma was relying on at the time, Mr. Lieberman, in order to qualify as a paraphilic of any kind of paraphilia, would have to have extant signs or symptoms of a paraphilic disorder, specifically within the last six months, significant urges or compulsions towards a particular kind of sexual behavior. In the instance of paraphilia not otherwise specified, that would be towards non-consenting females. Let me ask you this. You're familiar with these tests that Dr. Ritma conducted. Yes, ma'am. Is there some sort of question-answer sort of situation where the individual, Mr. Lieberman, is asked about fantasies? On several of them. So the tests that Dr. Ritma administered were primarily designed to measure psychopathy, compulsiveness, his ability to tell the truth, and whether or not he would be inclined to deceive, and whether or not he can control his behavior. During the two-hour examination, there were, in fact, questions about whether or not Mr. Lieberman continued to suffer from urges or fantasies that compelled sexual behavior. Has he ever indicated over the years that he had any of those fantasies? Well, Mr. Lieberman was convicted of several crimes. He also has admitted to his, you know, he recognizes that he was convicted of those crimes. Regarding whether or not he has paraphilia and OS, Mr. Lieberman's position is that he does not suffer from that disorder and that he does not have a mental disorder. Mr. Lieberman's opinion of himself, though, is irrelevant to both his statute and his... It is. It is. I agree. So I guess I'll repeat myself. Has he ever indicated over the course of any of these years that he ever suffered from any of these fantasies? Not that I'm aware of, no, Your Honor. But Dr. Whitman's opinion was based on more than simply just asking. Yes, I agree. I understand. I know there's more to the test than what I asked you. I just wondered if there were questions specifically directed towards that. Now let me ask you, is there a component to the 65 section detention that requires some probable cause that the respondent will not re-offend? There are two components under which Mr. Lieberman could establish probable cause. The first is that change, as interpreted by the Illinois Supreme Court in Ray Stanbridge, the establishment of a change in circumstances that shows that Mr. Lieberman no longer suffers from a mental disorder. That I understand. Is there any component of that that also requires for the probable cause hearing that the respondent will not re-offend? They're not codependent. It is one of two ways in order to demonstrate probable cause. Conditional or he no longer suffers from a mental disorder. Correct. So you're saying that under the statutes there's no requirement that the petitioner establish, not only that he no longer suffers from the mental disorder, but there's no further requirement. There's no requirement whatsoever under 65 that there be evidence that would suggest for purposes of a hearing that the respondent will not re-offend. So let me clarify. Under 67B1 is one path towards the establishment of probable cause as the court articulated in Stanbridge, which is as we've established that you no longer have the disorder. All right. B2 is the alternative path. Conditional. It is not for conditional release. No.  For example, an individual might suffer from, and this was articulated by Dr. Weidel in her testimony, an individual might continue to suffer from a disorder but be so incapacitated, for example, that they are no longer a risk to society and therefore are entitled to, or at least to probable cause for discharge, to be evaluated whether or not their detainment needs to continue. Yes. And those are alternative paths to the same end, which is the establishment of probable cause for a discharge petition. Was there testimony at the hearing that even Dr. Ripma conceded, or maybe it came from some of his tests, that there was between an 18% and 48% chance that Mr. Lieberman would re-offend? I can't recall the specific. I know that Dr. Ripma did administer a static 99, which is a chance of recidivism examination. Yes. And Mr. Lieberman scored within a normal or acceptable range on that score. What is that, 18% to 48% that he'll re-offend, that's normal? I can look at the record and rebuttal and respond, but I believe that is within the normal range, yes. That's considered normal, that an offender might re-offend, the percentage being between 18% and 48%, that there's a likelihood they'll re-offend, and you're saying that's normal? I believe that is within the auspices of the static 99 administrative test, that Mr. Lieberman's score was within the acceptable range of a likelihood of recidivism. Dr. Weidel's examinations over the years, whether she performed the test herself or relied on previous tests, typically Mr. Lieberman on state-performed tests scored above 70%, for example, as a likelihood of recidivism. Now, in both years previously and for Dr. Ripma, there's an issue of whether or not Dr. Weidel's examinations and administration of the static 99 take into account Mr. Lieberman's age properly. But really the substantive issue here is that there is new factual evidence, which has never been considered, as to whether or not Mr. Lieberman continues to suffer from this disorder. It has to be a plausible account, right?  Going back to one of my earlier questions, in the psychiatric community, is it considered plausible that a mental disorder simply goes away over time, over the passage of time? Is that something that's considered acceptable or accepted in the psychiatric, psychological community? Well, with respect, Your Honor, neither the state nor Dr. Ripma or Mr. Lieberman would agree with that statement. Dr. Weidel, the state's expert, testified that the disorder itself does not, quote, go away, but rather can be controlled. And it is the goal of the treatment at the facility where Mr. Lieberman is housed to teach control over compulsion, which is the specific issue in the Act that a mental disorder compels activity. But did Dr. Ripma say, wasn't his testimony that Mr. Lieberman no longer suffers from paraphilia, not otherwise specified? Correct. And now you're saying that the general thought in the community is that it's controlled with treatment. No, I'm not saying that that is the general thought. I'm saying that even the state's experts would disagree as to whether or not the disease can, quote, go away. But the substantive question is whether or not Mr. Lieberman has current, suffers from current signs or symptoms of the disorder. All right, but isn't that contrary to what didn't Dr. Ripma say, emphatically, that Mr. Lieberman no longer suffers from paraphilia, not otherwise specified? Was that his testimony? It's the basis of his report, yes. All right. I have a question. I'm sure the state's going to argue this, but you indicated that there was new facts. But they're alleging that Dr. Ripma's opinion did not rely on any new facts, any new research, or any, what was it, anything that was new in terms of professional knowledge. Yes, and Mr. Lieberman obviously disagrees with that. Dr. Ripma's opinion is, in truth, based on two new pieces of information. One is he's an Illinois SOMB qualified evaluator who administered a new series of tests. So the substance of the tests is box one, and box two is Dr. Ripma's analysis of those tests, which is that Dr. Ripma would expect Mr. Lieberman, if he did have paraphilia not otherwise specified and if he did have antisocial personality disorder such that sexual activity was compelled, that he would not be able to score within acceptable ranges on this array of tests or do so consistently. And why is that? How did he explain that? The tests, including the HAIR-PCLR, are specifically designed to determine whether or not a person is a psychopath and whether or not they have the ability to control antisocial behavior, whether or not they have the ability to control violent or unacceptable behavior, and whether or not they can be compelled either to indulge in an urge or fantasy or desire or cannot in fact control themselves. As part of that testimony, I don't know if it's Dr. Ripma, did he opine that just the fact that someone is contained in this environment for 33 years, that that's evidence that they can control their behavior? The fact that Mr. Lieberman has been in a controlled environment is, but without significant sexual violence within the facility or any kind of violence within the facility, is evidence of his ability to control his behavior. Now, Dr. Weidel had testified that that is relevant. And it's Mr. Lieberman's position that the consideration of his record, his 33 years of incarceration, including 15 years of civil commitment in a treatment facility, is evidence which should be considered for whether or not Mr. Lieberman continues to suffer from this disease. And again, to bring it back to the significant and low issue, is whether or not probable cause has been established. This is a low verdict on Mr. Lieberman and others who are detained. The only thing that he must establish is a clause. Does a case say that, or are you just saying that? Well, both the Illinois Supreme Court and in-rate detention of Hardin. They have defined the test. They don't refer to it as a low threshold or low verdict, do they? The low language, I believe, is taken from the Supreme Court's opinion in Hardin. In Stanbridge, where that test was clarified and expounded upon, it is the fact that detainees must establish either a change in circumstance, which includes a change in professional knowledge, a change in scientific evidence. It has to be a plausible account, doesn't it? Yes, absolutely. It needs to be a plausible account. Yes. Okay. Did Dr. Weidel ever explain why she wasn't aware of the test that Dr. Ripma had administered? No. She just was not aware of them. She was aware that Dr. Ripma had administered them at the time of her deposition. But she just wasn't aware of the type of test. Correct. For a certain amount of them. Now, she was aware of several of them, including some of the more important ones, the HEAR-PCLR, obviously, the MCMI-III, which is a test specifically designed to measure psychopathy and compulsion, and several of the personality exams. The few that she was not aware of are substantive and relevant, and in between the time that Dr. Ripma administered them and the time she was deposed, she didn't, as far as I'm aware, she testified to, didn't research them. Do you have an expert opinion that Lieberman can now control his urges without medication? Dr. Ripma opined that he is controlling. Should he have them, they are under control. There is no evidence that Mr. Lieberman continues to suffer from any urges or fantasies to commit sexual violence. He was able to do this without medication? Yes, and even Dr. Weidel would agree that, with the instance of PNOS at least, medication is not the issue. It is a matter of learning skills to be directed towards control therapy. And he could do this without mental health treatment? Dr. Ripma's opinion is that Mr. Lieberman has no present signs or symptoms of this mental disorder. Well, I would think that if you want this court to be able to overturn what the circuit court has done, that certainly I don't think Mr. Lieberman is in a position to refuse any examinations. I mean, that's just my personal opinion. Understood, Your Honor. Several of Mr. Lieberman's appeals in the past have dealt with whether or not Mr. Lieberman would be either incriminating himself or giving up certain rights, appellate rights, by participating in an examination. How could he be incriminating himself? I mean, how could he be incriminating himself? Those briefs and arguments have actually come to an end. Whether or not Mr. Lieberman participates in an examination for the state's expert is a separate issue from whether or not he continues to suffer from these signs or symptoms of having this mental disorder. Dr. Weidel, as both the Illinois Supreme Court and I believe this court have said, as the state's expert, should he refuse, is entitled to rely on the paper record, which she testified that she did. She relied on the criminal evidence as well as his incarceration record. And several of the tests, including the static 99R, can be administered without Mr. Lieberman's participation. It is the evidence, the new evidence that Mr. Lieberman has put forth, which did require his participation. Several of the examinations he personally filled out under Dr. Ripma's supervision. Does Dr. Ripma's testimony lose this notion of being plausible or even credible when he insists upon going back to this idea that respondents' other life experiences, totally unrelated to a mental disorder, are what caused the original offenses? So with respect, Your Honor, no. That does not impugn the plausible account issue. For one, Dr. Ripma's opinion does not rest on this interpretation or any understanding of what motivated Mr. Lieberman's crimes. And nowhere in the Act or any case law is Mr. Lieberman obligated or any experts testifying the half obligated to provide some sort of plausible account that explains criminal behavior. No, but even, my question was, does his opinion lose this notion of some plausible opinion because of his opining in this other regard? And with respect, Your Honor, no it does not. Dr. Ripma's opinion does not rest on an understanding or interpretation of Mr. Lieberman's motivations for his predicate crimes. His opinion, and to the extent that he was pushed during a deposition to offer speculation on what might have motivated Mr. Lieberman's crimes, is irrelevant to his actual performance of an examination of mental disorders. At the end of the day, the doctor did say that he no longer suffers from a mental disorder. And his opinion was that it wasn't really based on this other notion. He held the opinion that Mr. Lieberman, if he did suffer from a mental disorder, he no longer suffers from it. That's correct, Your Honor. Dr. Ripma acknowledged that it has been determined that Mr. Lieberman suffers from a mental disorder. And to the extent that he did or has ever, it is not present now as far as Dr. Ripma was able to determine. But didn't Mr. Lieberman already come to that conclusion a long time ago, indicating that he didn't need any treatment? He didn't have any issues that needed to be dealt with? With respect, Your Honor, Mr. Lieberman's opinion of himself is not particularly relevant to whether or not he should be discharged. Well, it's part of the interview process with Dr. Ripma, correct? It is, and Dr. Ripma is an Illinois SOMB qualified evaluator who has spoken to many paraphilics, who has diagnosed individuals with paraphilia not otherwise specified, and has recommended commitment of individuals, and I'm sure knows the difference between the value of an individual's statement that I don't have a disease and whether or not that person in fact does. This is totally academic. Did they remove, or is there still this ongoing effort to remove paraphilia not otherwise specified from the D, S, M, H, whatever volume we're up to now? The most recent version is the DSM-5, Your Honor, and paraphilia not otherwise specified is not currently a disorder under that diagnostic criteria, and Mr. Lieberman in his most recent two reports from Dr. Weidel has not been diagnosed with paraphilia not otherwise specified, and if you look at the language for sexual sadism versus the language that was previously used for paraphilia not otherwise specified, is there any verbiage or words or anything that would actually distinguish those two? Yes, the diagnostic criteria. For one thing, this is a live issue in front of the trial court still going on in front of Judge Porter based on the 2013 Dr. Lieberman's position that the diagnostic criteria for sexual sadism in the DSM-5 is distinct and separate from any diagnostic criteria for paraphilia not otherwise specified. But isn't the language almost remarkably similar? The language for sexual sadism in the DSM-5 is the same criterion, the diagnostic criteria, as the language in the DSM-4TR for sexual sadism. Okay, not paraphilia, NOS, not otherwise specified? No. For one thing, the way that paraphilia not otherwise specified is presented in the DSM-4 is essentially as a diagnosis of last resort, meaning there is paraphilia. So you're saying the words, the language, I think you described it differently than I did. To diagnose it, you're saying that the criteria are totally different? There's for several of the paraphilias in both versions. But it was removed from the most recent. I thought paraphilia not otherwise specified has been removed from volume 5? Correct, and it has been. I'm speaking of paraphilias generally, which would include sexual sadism and other disorders. A typical diagnostic criteria that Your Honor might see there is repeated urges or fantasies or compulsions within a six-month period of whatever the specific paraphilic behavior is. So in the instance of sexual sadism, it would be sexual sadistic activity. In the instance of not otherwise specified in the DSM-4TR, it would be not otherwise specified paraphilic activity. In this case, for Mr. Lieberman, it's been non-consenting females as the paraphilic activity. So under 5, did Dr. Weidel opine what his mental disorder is that he suffers from? The substance of today's appeal is the 2011 report. Which goes back to the previous form? In which case, Dr. Weidel relied on the DSM-4TR. And in her 2013 and 2014 reports, Dr. Weidel relies on the DSM-5 and has testified in her report, stated that Mr. Lieberman does not have paraphilia not otherwise specified. He, in fact, suffers from sexual sadism. And you're saying the language or the criteria is not at all similar? Correct. That is the position that Mr. Lieberman has been putting forth before Judge Porter. Anything further at this time? I'll reserve the rest of my time. Mr. Iskowich? Thank you. Good morning again, Your Honors. Mr. Pesci, may it please the Court. Again, my name is David Iskowich. I'm with the Illinois Attorney General's Office on behalf of the people. If I could just step back a few moments in response to Justice Wray's concern about the nature of the tests that Dr. Ritma employed here. I think that the easiest way to resolve this appeal is by taking a look at the framework established in Stainbridge and then applying those rules to the evidence that Dr. Ritma submitted in support of Mr. Lieberman's petition for discharge. Mr. Lieberman argues that much of the data that he had used there and presented to Judge Porter was, in fact, new. A closer examination, however, reveals that it was not. Many of the same conclusions that Dr. Ritma arrived at were rejected in previous proceedings. And to the extent that there was any, quote, new test or new examination employed in this case, that wouldn't pass muster under Stainbridge. In Stainbridge, which was a consolidated case with two respondents, Mr. Stainbridge and Mr. Lieberman, the respondent, Stainbridge, argued that a new psychometric exam on risk, the static 2002-R, which did not, which was not employed at his original trial, resulted at a new reading, some new metrics and new data with respect to his risk of reoffense based upon some new considerations with his age. And the Supreme Court rejected that roundly, acknowledging that even though it was a new test, never having been employed, it rested primarily on the same factual basis that the old static-99 test that had been applied at trial, the result that that test came from. It noted that not only was the result from that test premised on mostly the same factual basis, namely the respondent's age, but it also noted, perhaps more significantly, that the test score was remarkably the same as the test score arrived at at the original trial. And this goes to a concern that Justice Gordon had earlier about the test scores. In this case, perhaps it was Justice McBride, about what exactly did the test score on the static-99-R in this case show? It showed that Mr. Lieberman scored at a 7. And a 7, if you look at the static-99-R scoring sheet, the scoring of that stops at 6. 6 and above is in the high risk. So not only did this test, the static-99-R, I'm using that as an example, result in the same test score that we already had from the original trial, which was employed by Dr. Buck, the static-99, but it also was dependent on the same factual basis, for lack of a better word, the respondent's age. Your opposing counsel said that that score was within a normal range. That's not true, Your Honor. That score is a high score. That's a 7. And that's the same score that Dr. Rosell, in a case like this, had under the static-99-R. Do you agree that there's no component to this whole proceeding regarding some sort of provision that Mr. Lieberman showed that the defendant was sexually violent? It is, Your Honor. Section 65 says that he has to provide a plausible account that he's no longer sexually violent. No longer sexually violent is comprised of, there's actually three elements to being sexually violent. The first is you have to be convicted of a sexually violent offense. That's not a question here. The second is you have to have a mental disorder. And the third, which I think Your Honor is referring to, is that you have to show that there is not a substantial likelihood of reoffense if released into the community. But isn't the doctor's opinion at this point that he no longer suffers from a disorder? Isn't that his bottom line opinion? That's his bottom line, correct. I don't know that under Stainbridge we're supposed to be going any further than that. I don't know that the trial judge or this panel should be going any further to look into what's plausible or not. In terms of making credibility determinations. Absolutely not, Your Honor. This was the lesson we learned from Stainbridge that credibility can't be an issue here. This is a preliminary proceeding. He has to show by probable cause that he no longer has a mental disorder and that he's no longer at risk of reoffense. He can show one of those. If you take it as it is or just what he said, his opinion is he doesn't suffer from a mental disorder. Shouldn't then we move forward to this probable cause hearing? No, because the basis of that opinion has to comply with the rules set forth in Stainbridge, which is it can't be based on old news. It can't be based on old data. It can't be based on old opinions that have been previously rejected. Now, hold on there a moment. Didn't Dr. Ripma perform multiple tests that were not even in existence at the time? He did, Your Honor. So aren't those new tests? They're not, Your Honor. Regardless of what the result is, aren't those new tests? They are new tests. He didn't make them up. No, no, he didn't, Your Honor, but returned it to Stainbridge, and I think it's in paragraph 76 of that opinion. There was a new test, the STATIC-2002-R. Dr. Witherspoon employed it at the post-commitment stage. This was a new test, never having been employed on this respondent. The respondent had been tested under the old STATIC-99. The STATIC-2002-R was not in existence at the time of his trial, yet the STATIC-2002-R was not good enough for purposes of probable cause because it didn't provide remarkably different results, and it was based upon the same facts. The actuarial test was based upon essentially the same facts that the old one was. Can you say that every one of these tests were the same results from before? Yes, Your Honor. Several of them weren't even relevant to the inquiry about sexual violence. They weren't? No. One of them, I believe the SILS, tested his reading comprehension. One of them, the MCSDS, the Marlow-Crown Social Desirability Scale, tested his ability to answer questions on tests in socially desirable ways. I'm not even really sure what that means. Dr. Rittman's explanation provided real note guidance on that. Two of the test results, the PAI, the Personality Assessment Inventory, and the MCMI Millen Clinical Multiaxial, those are personality tests. And in his deposition and in his report, Dr. Rittman made absolutely no mention of these tests within the context of a mental disorder, paraphilia. He only opined that these tests might possibly suggest the absence of an antisocial personality disorder. And what was the basis, or what were the basis of his mental disorder? Those four tests, and then two more. The BIS-11, which measures impulsivity. Yes. Is that a new test or not? It's a new test, but Dr. Schmidt, at a previous post-commitment hearing, which was unsuccessful, that's the one that went up and comprised half of the Stainbridge case, opined that this respondent did not exhibit characteristics of impulsivity, which might be a characteristic of somebody suffering from paraphilia. And Dr. Rittman never testified that the lack of impulsivity standing alone would render anybody not sexually violent. He simply said that in this case, it would indicate that the paraphilia, it would, I guess, undermine the paraphilic diagnosis. The last one is the Iowa Gambling Task. That test measures what is called executive functioning and decision making. Executive functioning, in this case, in previous appeals, that's similar to the GAF, or global assessment of functioning test, which Dr. Schmidt employed back in 2008. What's the test that is conducted to determine the likelihood to re-offend where Mr. Lieberman scored a 7? That's the static 99R. And did Dr. Rittman conduct his own static? Yes, he conducted. And what did Mr. Lieberman score on that? A 7. Is that what he scored previously? Yes. Has he ever been higher? No, he's always scored a 7. And a 7 means that there's an 18 to 48 percent likelihood that this person will re-offend. It's a, in this case, I believe it fell somewhere between 17 and the mid-40s, and it's a likelihood that some, I read 18 to 48 percent, but I could be wrong. No, I don't think you are, Your Honor. I think that Dr. Weidel also opined that under the static 99, the percentages were very similar. Maybe perhaps two or three points above the high point and the low point, but that is considered a high score, and just to, for the record, that doesn't test the probability that this particular respondent will re-offend, but that tests, that measures people who score within that range generally. That's the percentage of people generally who will re-offend within that range. All right. Okay. With respect to... And you disagree that that's normal? That's not normal. That's high. All right. Well, I'm just asking. Yes. Oh, I'm sorry, Your Honor. Because you said it was within a normal range, or at least Dr. Rittman maybe said that. Perhaps, but so what Dr. Rittman did, I think what he did is he, this is a seven. No one can deny that this is a high score, but then a lot of these other metrics he employed to, which are called dynamic risk factors, which apart from the strict actuarials can provide the examiner with maybe a more thorough review of the respondent's condition. What would a doctor have to satisfy, in your opinion, to warrant a probable cause hearing? Sure. Well, Stainbridge suggests there's three things that a respondent can do. He can show that there's been a change in his condition. Yes. Well, Dr. Rittman said that. He said, he did say that, but all of the metrics that he used had been previously, had been debunked and rejected. Now, in our view, a change in condition has to be something more than simply sitting down, giving self-administered tests and coming back with a result and calling that probable cause. This respondent has never been in treatment. He refuses to acknowledge there's anything wrong with him in the first place. Going, starting, there's a five-phase treatment at TDF that's available for this and all respondents. Starting treatment, acknowledging that you have a problem, learning how to cope with it, to deal with it through various strategies they use in counseling. Is there any psychiatrist or psychologist out there that would opine that someone who suffered from a mental disorder of a sexual nature, such that they at one point were a sexually violent person, that they could no longer suffer from the disorder without any kind of treatment? Treatment is but one thing. What are some of the other methods used? Perhaps a physical disability, perhaps a mental incapacity, perhaps physical and mental incapacity, which would render the person unable to act out on his urges. And what did Dr. Rittman opine about that? What did he say? He didn't say anything about either of those things. He opined about neither the effectiveness of treatment, nor did he say that there was any physical problem with this respondent. Well, didn't he use the tests as a basis for his opinion that he no longer suffers from this disorder? Yes, but under Stainbridge, those tests are inconsequential. So you feel it's an improper basis? Yes, Your Honor. The other way, Your Honor, that a person might show probable cause, and this comes from Stainbridge as well. You said there were three. There's three, yes, Your Honor. All right. The other one is perhaps that there's a change in the meaning of sexually violent. Perhaps the General Assembly decides Well, isn't that occurred? No, Your Honor. Well, is that for the next day or something? No, I'm not speaking of that. Now, does it have any impact on us that five no longer includes the diagnosis of paraphilia not otherwise specified? Well, I take some issue with that. It's now called other paraphilic disorder, Your Honor, and there is some litigation ongoing about whether that matches up with paraphilia NOS. We believe that it matches up adequately, that it's in effect the same disorder. All right. Well, go on with your next. So if the General Assembly had decided to We want to add a fourth element. A person is sexually violent if the diagnosis that leads to his commitment is made within X number of years after he committed his last crime. That would be something that would obviously trigger probable cause for everybody in TDF because that element didn't exist when they went in. And then the third way is to show that there's been a change in methodology. And the change in methodology we submit would take more than a new test or a test that rehashes old results. It would have to be something more comprehensive and more diagnostic in nature. Not something that measures ancillary matters such as impulsivity or executive functioning or risk aversion, those kinds of things. We don't know what this test is now. It might not exist. It might exist at some point down the road. But as far as methodology is concerned, that's a more global concern in our view. It does not come into the gambit of this case. Let me ask you this. Did Dr. Ripma, in his own opinion, indicate that any one of those tests that he conducted was something new in terms of methodology that was recognized in the psychiatric and psychological community that tests whether or not someone still is a sexually violent person? No, he never testified that this constituted a new methodology in the scientific community for testing in these kinds of cases. He simply said they were new tests. And that's what the respondent says as well. He tries to say they're a new methodology. So he did say that? No, no, no. What do you mean you said he tries to say that? My opponent says they constitute a new methodology. But under the same conclusions that have already been rejected in the St. Bridge case provides adequate guidance on that question. I don't have any further points to make unless your Honor has any further questions I'd be happy to finish up. I have a question I asked previously about Dr. Weidel. Sure. In terms of her unawareness of the tests that Dr. Ripma had administered, did she offer anything in terms of the evaluations that the tests found in terms of contrary tests that maybe could have been conducted? No, she didn't comment on that your Honor. And she didn't employ those tests either. To the extent she didn't know those tests we don't think that's relevant at the probable cause stage. That might be something if this case does move forward to a report standing on its own is adequate and the respondent did not show probable cause based upon her report either that he's no longer sexually violent. He makes two primary arguments in his brief with respect to Dr. Weidel's report. I'll briefly address them. The first is that she never employed the newer version of the PCLR, the Hair Psychopathy Checklist. I believe the Court has already pointed out however that to employ that test it's better to meet with the actual subject and this respondent has consistently refused to meet with Dr. Weidel. He did meet with one state expert several years ago, Dr. Ostrov, but I think that was about five or six years ago. So that's the one expert he has agreed to meet with. The second point is that the respondent makes in his brief is he challenges Dr. Weidel's opinion on the basis that she relied on nothing but his prior criminal behavior to arrive at her opinion and that's belied by the record. Dr. Weidel's report and her deposition plainly show that she relied on a number of sources in arriving at her opinion, not least of which was her own clinical judgment. She relied on... What were they? Other doctor's reports? Other doctor's reports, his master file at the Department of Corrections, his criminal history, his juvenile history, his illegal acts within the Department of Corrections. His refusal to participate in treatment was a very big factor in her decision that he remained sexually violent. So it's not true to say that she only relied on his prior criminal behavior. That's not to say however that that standing alone wouldn't be enough. His prior criminal behavior dates to the late 70s and early 80s and the respondent complains that that's too far of a gap to arrive at an accurate diagnosis. But Hendricks and our own Supreme Court and Samuelson say that it's perfectly acceptable for an expert to rely on prior criminal behavior to arrive at a current diagnosis and that's what she did arrive at was a current diagnosis. And at one last point in Hendricks, the respondent attempts to distinguish that case on the basis that the diagnosis was closer in time to the respondent Hendricks' criminal behavior. But if you read Hendricks it will show you that the expert in that case who was testifying I believe in the mid 90s was relying on criminal behavior exhibited by the respondent Hendricks from as far back as the mid 1950s and into the 1960s and then later. So that point should be rejected as well. If the court has no further questions, thank you for your time. We request that the court affirm the judgment below. Thank you. Thank you, Your Honor. I'd like to clear up a few things from Mr. Esquivel's presentation. First is the issue of the tests or specifically the issue of recidivism. Recidivism is not the basis for Dr. Ritman's opinion that Mr. Lieberman no longer suffers from a mental disorder and it is not the basis upon which Mr. Lieberman has argued to the circuit court or to this court that he has established a probable cause that he no longer suffers from a mental disorder. Recidivism in this case would be an issue for whether or not Mr. Lieberman is so substantially probable to commit an offense that despite the fact that he doesn't show evidence of a disorder it should still be contained. That is an issue for a fact finder or for a jury. That is not an issue for whether or not Mr. Lieberman has met this threshold requirement of a plausible account of whether or not he is a sexually violent person. Of whether or not he no longer suffers from the mental disorder for which he was originally convicted by a jury in 2006. Your position is strictly we're only looking at whether or not he suffers from a mental disorder. There's no component regarding the statutory umbrella that defines a sexually violent person. As I said earlier there is a component of 65b2 which does direct a path to establishing a probable cause should you be able to prove that you no longer pose a substantial threat of sexual violence in the future. A substantial risk of recidivism. That is distinct from the issue before the court which is whether or not Mr. Lieberman continues to suffer from a mental disorder that compels that behavior. If you asked us to focus in on any of the tests that would support your position for this hearing, what would you tell us to direct our attention to? I would direct the court to two things. First of all there are two well qualified SOMB evaluators who have a difference of professional opinion and expert opinion as to whether or not Mr. Lieberman has this disorder. There's different evidence that supports those conclusions and different weight that's been given to those pieces of evidence. Those are factual disputes which need to be resolved. That's undenied in the record. Most of Mr. Iskowitz's arguments this morning go to weight as to whether or not those tests should be weighted properly, whether or not they overcome some issue of a plausible account. The fact is that there are differing expert opinions about whether this man has a mental disorder and whether or not he should be incarcerated for it. But that was true in Stainbridge, wasn't it? There were differing opinions. It was true that the state testifying experts in this instance... But it wasn't enough at that point. It wasn't and the reason for that in part was the Illinois Supreme Court's opinion that Dr. Schmidt was not a qualified examiner for the purposes of evaluating an SVP. But that's not going to take us to where we need to go. Just the statement that someone's a qualified evaluator. I said can you direct us to which of these new tests that he conducted should we focus in on to reach the conclusion that you've met this very low threshold? Sure and I'll quote the state from this morning. The administration of the revised CARE PCLR, the 2002 version I believe, which neither Dr. Weidel nor any state expert before has administered to Mr. Lieberman was administered by Dr. Ritma and Mr. Lieberman did have remarkably different results. What was the test designed to tell us? The test is designed to measure whether or not Mr. Lieberman is a psychopath capable of violence. Not impulsivity. That's a different test? There are other tests which measure impulsivity. So this test says it was designed to determine whether he's a psychopath? Correct. Alright and that's the one. Any others of the test that Dr. Weidel did? Is that test going to have any reflection on whether he's going to be a repeat offender or not? If Mr. Lieberman is not a psychopath and is no longer suffering from a mental disorder that compels sexual violence, one would not anticipate him to commit acts of sexual violence. I mean is that part of the doctor's opinion? It is the opinion of the state of Illinois that Mr. Lieberman suffers from a mental disorder that compels sexual violence. No, no, I mean did the doctor say that that test supports his opinion that Lieberman would not be a repeat offender? It supports the opinion that Mr. Lieberman does not currently suffer from a mental disorder that compels violence. Alright, so you're telling me that that test does not show that he's not going to be a repeat offender? You're not answering the question. You know, in the law, experts could say anything they want to say. But they have to have a basis. And the basis has to be accepted by the court. And one of the opinions here is whether he'll be a repeat offender. And I don't see any basis even with your expert that would show that he won't be a repeat offender. The basis for Mr. Lieberman's commitment and the removal of his liberty is that he suffers from a mental disorder that will make him a repeat offender. We typically do not keep people in civil detainment just because we think that they might recidivate, unless there is a basis for doing so such that their volition is compelled over their likelihood of recidivism. It is the foundational principle behind the act that a person must suffer from a mental disorder. And it is Dr. Ritten's opinion that Mr. Lieberman does not suffer from that mental disorder and that his violence, sexual violence or otherwise, would not be compelled by that mental disorder. And therefore the state no longer has the right to keep Mr. Lieberman in custody. So you're premising that on the fact that there has to be a mental condition that Mr. Lieberman does not now have. Absolutely, Your Honor. It is the foundational principle of the act as well as the constitutionality of the act in keeping people in civil detainment. Statistically speaking, we could do an analysis on many civilians in Illinois. I understand what you're saying, but it all comes back down again to the fact that he had no mental treatment. He's refused an examination. All of those things come into the same equation. With respect, Your Honor, the act, particularly in the most revised version and as articulated under Stanbridge, is very clear about where those issues apply. So in the issue of treatment, that is expressly to be considered as part of conditional release, which Mr. Lieberman is not seeking currently. The issue of discharge is divided into two. Whether or not he has probable cause and whether or not he has a mental disorder and whether or not he's likely to recidivate. I think what we're trying to get from you, Mr. Pesci, is this idea that how did Dr. Ripma come to the conclusion that Mr. Lieberman does not suffer from a mental disorder? Because there is no evidence that Mr. Lieberman meets the diagnostic criteria for PNOS within the last six months or even up to a year, if we're being generous. Based on the history that we have, we look back at all the opinions regarding this particular case, did he explain to the court how would he explain that other than his statement that he didn't think he ever suffered from it, let's try to put that aside. I would, yes. Okay. And I'm happy to do that and I'm willing to do that. I'm trying to get to what is the crux of how he got to this point where he can say he doesn't suffer from this disorder. Because he took some tests, he conducted the tests and those tests, he doesn't meet the criteria for the disorder based on his test results? It's two elements, Your Honor. In order to meet the diagnostic criteria, Mr. Lieberman would have to show some signs or symptoms of having PNOS within the last six months. Specifically, urges or fantasies that compelled sexual violence within his particular paraphilic category. There is no evidence. The doctor examined the record, the same record that Dr. Weidel was allowed to look at and found that there is no evidence within the last six months or even substantially longer. And Dr. Weidel would testify all the way back to the original crime. How do these doctors determine that particular one about the fantasies? In Dr. Weidel's instance, she found that fantasies did exist and during her deposition she testified that the reason for that conclusion was that because she already thinks that he has PNOS. So that becomes a circle in which Dr. Weidel believes that he has PNOS and therefore he must suffer from fantasies and because he suffers from fantasies he must have PNOS. All right, but how does Dr. Ripma come to the conclusion that he hasn't in the last six months suffered from any of these fantasies? Dr. Ripma's opinion is based on the fact that if he were suffering from, first of all, an examination and the tests, if Mr. Lieberman was suffering from ongoing urges or fantasies that compelled sexual violence, there would be some evidence of that that Dr. Ripma would be able to see. And what would that generally be? Can't you tell me? You're very much involved in this case. What are the kinds of things that would indicate to the doctor that there's ongoing fantasies? One would be a person admitting to it, which is a component. And he's never admitted to that ever, has he? No, not that I'm aware of. Another would be continued misbehavior. So this all kind of goes back to the whole idea that he really never ever had this disorder. Isn't that really what Dr. Ripma's bottom line is then? No, it is not. The opinion that he didn't have the disorder or might not have had it is irrelevant and not the basis for Dr. Ripma's current opinion, which is that there's just no evidence of it. If you used to have a disease, any disease, I had a cold once, I don't have any evidence of it now, it's very likely that I don't continue to have it. I don't know that we can analogize the common cold with a mental disorder that a number of doctors have indicated he suffered from and still suffers from. If you'll forgive the analogy, the diagnostic criteria in the DSM-IV-TR specifically says that, and Dr. Weidel has confirmed, that Mr. Lieberman must have ongoing urges or fantasies for sexual violence in this particular paraphilic category within the last six months. It's clearly within the record that Dr. Weidel agrees that it's a diagnostic criteria, and she has no basis for confirming that that is in the record. But what does Dr. Ripma have to confirm that he doesn't have any of these ongoing fantasies? There is no evidence of it. He looked for evidence of it and did not see any of it. He administered psychometric exams. Which test was designed specifically to determine whether or not he has, for the last six months, any ongoing fantasies? No test was designed or administered on that specific question. Well, which one did he rely on? To come to that conclusion, it was an amalgam of his observations, his interviews with Mr. Lieberman, a review of his record, and the administration of the psychopathy tests. Just tell me, of all those tests, which one or ones do you think best supports Dr. Ripma's opinion that he doesn't suffer from this mental disorder? The most remarkably different result was in the administration of the HAIR-PCLR. And that's the one test that she didn't conduct and she said maybe she could have? Correct, Your Honor. How could she do it without him allowing her to interview him? It can be administered without participation. That one, and what's the other one you were going to say? With respect, Your Honor, Dr. Ripma states clearly that he relied on the results of all of the tests, including their consistency, which is that there were no outliers in the exam. Is one of those tests designed to determine executive function? Yes, it is. Is one of those designed to detect impulsivity? Yes. Okay. And the executive decision test, you're going to say, strongly supports Dr. Ripma's opinion, or at least as one of the bases that he no longer suffers from the mental disorder? Dr. Ripma relies on the administration of all of the tests and their consistent results to show that Mr. Lieberman is not a psychopath or compelled to commit acts of violence. Did Dr. Ripma ever find that Lieberman had fantasies in the past? Not that I'm aware of. I believe it was outside the scope of his opinion, and not that I recall it being. So if Dr. Ripma never found that to be the case, then how can Dr. Ripma now say that he doesn't suffer from fantasies? The issues are mutually exclusive. Dr. Ripma acknowledged and agreed that the courts as well as the jury and several of the doctors have already diagnosed Mr. Lieberman with PNOS, and both at his deposition and in his report, he accepts that as being true and says there's no evidence that Mr. Lieberman now meets the diagnostic criteria for that disorder. Do you want to sum it up? Yes. Mr. Lieberman has been incarcerated for 15 years based on a diagnosis of paraphernalia not otherwise specified. He continues in this day to be civilly detained. The basis for that is a diagnosis of this disorder. There is now significant evidence that Mr. Lieberman does not have that disorder anymore, and the difference of opinion, which should be metered out before a proper fact finder. The request for establishing a probable cause is only that Mr. Lieberman show a change in circumstance, including new professional evidence, new scientific evidence that shows that he no longer has this disorder. That has clearly been established. What remains, including many of the issues that were discussed today, go to wait and whether or not Dr. Ritman's opinion justifies discharge, which is not the issue that was presented to the trial court, not the issue subject to today, and is not the issue taken up in 65B1. Mr. Lieberman respectfully requests that the court remand for a trial in America. All right, thank you both. The case was well argued and well briefed, and we will take it under advisement, and we're going to take a brief recess to reconfigure our panel for the next 12 hours.